LANIER, Judge.
This is a suit for damages in tort alleging that the plaintiff-appellant, Rosemary K. *1232 Sellers Jacobs,[1] was injured from inhaling toxic creosote fumes for which the defendants were responsible. Suit was filed by the appellant against Power Rig Drilling Company (hereinafter referred to as Power Rig) and its insurer, Houston General Insurance Company; C.M. Miciotto & Sons, Inc. (hereinafter referred to as Miciotto) and its insurer, Employers Mutual Liability Insurance Company of Wisconsin; and Floyd J. Breaux Painting Contractors, Inc. (hereinafter referred to as Breaux Painting) and its insurer, Royal-Globe Indemnity (Insurance) Company. The Travelers Insurance Company (hereinafter referred to as Travelers) intervened in these proceedings as the workmen’s compensation insurer of appellant’s employer for $24,032.40, representing $19,680.00 for compensation benefits and $4,352.40 for medical payments. At the close of the plaintiff’s case, the trial judge granted a directed verdict in favor of Power Rig and its insurer. The jury found that the appellant was entitled to a verdict against Breaux Painting and Miciotto and their insurers and gave a lump sum award of $5,000.00. The trial judge ruled that Travelers was entitled to judgment on its intervention. The appellant took this de-volutive appeal and claims that the jury award is inadequate.
I. FACTS
In November of 1976, appellant was employed by the Life Preserver, a vitamin and health food store, located in Morgan City, Louisiana. The office of Power Rig was located in the samé building. Power Rig contracted with Miciotto for certain renovation work on the office. Miciotto subcontracted the painting portion of this work through Breaux Painting. During the Thanksgiving holidays of November 1976, Alton Breaux, an employee of Breaux Painting, used Cabot Creosote Stain to paint the doorframes in the Power Rig office. The building housing the Life Preserver and the Power Rig office was closed over the Thanksgiving weekend. The appellant returned to work at the Life Preserver on November 30, 1976, and suffered an allergic reaction and bronchitis from the inhalation of creosote fumes which were circulated throughout the building by the air-conditioning unit.
On December 2, 1976, the appellant consulted Dr. F.H. Metz, Jr. at the Fairview Hospital in Morgan City, Louisiana. She gave a history of inhaling fumes several days before at the place where she worked in Morgan City. She described her symptoms as shortness of breath, wheezing and a skin rash. When the symptoms did not abate, she called Dr. Metz. Dr. Metz examined appellant and discovered a slight amount of respiratory distress, breathing a little fast, some wheezes, and a cough. Dr. Metz diagnosed appellant’s condition as a moderately severe chemical bronchitis secondary to allergy with contact dermatitis. He treated her primarily with cortisone and determined that she was disabled at this point in time. Appellant remained in the hospital from December 2, 1976, to December 5, 1976, when she was released for two days to attend the funeral of her son who was killed in an accident. Appellant was readmitted to the hospital on December 7, 1976, and remained until December 12, 1976.
Dr. Metz again examined the appellant on December 15, 1976. She gave a history of having difficulty in breathing and some hair falling out. The doctor’s examination determined that her breath sounds were clear and she had no wheezes. At this time, Dr. Metz referred appellant to Dr. William Coulter, a specialist in internal medicine. On December 16,1976, appellant was examined by Dr. Coulter. She gave a history of inhaling Cabot Creosote Stain at her place of work and becoming short of breath, coughing, and getting a skin rash. Dr. Coulter’s examination revealed that the appellant no longer had a skin rash. Her chest X-rays were normal and she had no congestion in her lungs. Lung function and pulmonary function tests were performed to determine the capacity of her lungs to take in oxygen and blow off carbon dioxide *1233 and the results were normal. Tests were run on her blood gases to determine the capacity of the lungs to absorb and the blood to carry oxygen and carbon dioxide and they were also normal. Dr. Coulter diagnosed the appellant’s condition as allergic bronchitis and determined that she was not disabled at that time. Dr. Coulter saw the appellant again on December 20, 1976, and she complained of pain in her chest on deep breathing. Dr. Coulter did not find any objective symptomatology at that time.
On January 6, 1977, the appellant returned to Dr. Metz and gave a history of visiting the Life Preserver and that her face started burning and her voice became hoarse. Dr. Metz’s examination revealed no positive findings except for “a little cold”. Appellant returned to see Dr. Coulter on January 10, 14 and 20, 1977. She gave a history of having returned to her place of work and developing shortness of breath, pain in the chest, and a cough. Dr. Coulter did not find any objective symptomatology other than a bacterial bronchitis which a sputum culture revealed to be caused by staphylococcus aureus. Dr. Coulter was of the opinion that the bacterial bronchitis condition was unrelated to the creosote allergy. Dr. Coulter prescribed an antibiotic, ampicillin, to treat this condition. Dr. Coulter was of the opinion that appellant was not disabled when she was in his office, but could become disabled if she breathed the allergen which caused her reaction. In his deposition, which was read to the jury, Dr. Coulter was of the opinion that if appellant was not exposed to creosote fumes since January of 1977, but continued to have allergic reactions, that she must also be allergic to something other than creosote.
On January 24, 1977, appellant returned to Dr. Metz. She stated that she was taking ampicillin prescribed by Dr. Coulter and gave a history of nausea, vomiting, diarrhea with bleeding, and severe headaches. Dr. Metz diagnosed this condition as a reaction to the medication and directed appellant to stop taking the medication. On February 8, 1977, appellant returned to Dr. Metz complaining of a sore throat. A throat culture was taken and showed a staphylococcus infection. Dr. Metz could not say if this infection was related to the creosote exposure. Appellant again returned to see Dr. Metz on February 10, 1977, complaining of burning in her stomach. Appellant saw Dr. Metz again on February 23 and 28, 1977. At this time, Dr. Metz determined that her throat was better. Dr. Metz testified that appellant never evidenced any respiratory problems prior to November of 1976.
On March 9, 1977, appellant went to Dr. Victor Feske. Appellant gave Dr. Feske a history of inhalation of creosote based paint fumes at her place of work several months previously. Dr. Feske’s examination revealed occasional rhonchi (harsh, abnormal lung sounds) and “obvious presence of irritability of the respiratory tract”. Dr. Feske had no objective findings of the nose or throat. He felt that the appellant was disabled at that time because she had “great respiratory distress” caused by exposure to irritants, such as dust, cigarette smoke and chemical fumes, which resulted in symptoms of cough, shortness of breath, pain on respiration, watery eyes and sneezing.
Appellant returned to see Dr. Coulter on June 3, 1977, and apparently was referred to Dr. William Brooks Emory, a specialist in internal medicine with a sub-specialty in pulmonary medicine, at the Ochsner Hospital in New Orleans. Dr. Emory examined the appellant on June 21, 1977. She gave a history of inhalation of creosote fumes at a health food store in Morgan City, Louisiana. She complained of shortness of breath, pain in her chest, and difficulty in breathing. Dr. Emory testified that during the course of his examination of the appellant, she talked to him in whisper tones due to a “claimed” hoarseness. An examination of the eyes, ears and nose was normal and her pharynx was clear. Her lungs were clear and she had no squeaks, rattles or wheezes. Appellant’s breathing was tested with a digital flow meter and it was within normal limits. Dr. Emory found no objective physiological evidence of impairment and his examinations were within normal limits, except for appellant’s moderate overweight. Dr. Emory recommended a personality pro *1234 file for appellant because her symptoms far outweighed the objective findings.
The medical bills filed of record show that during the period of June 21, 1977 to February 4, 1979, the appellant on several occasions visited different doctors and a chiropractor. These doctors were not called to testify at the trial or by way of deposition. Accordingly, there is no expert medical evidence concerning the appellant’s condition during this period.
On February 4, 1979, appellant returned to see Dr. Feske complaining of chronic respiratory problems and irritations. Dr. Feske’s examination revealed harsh, abnormal lung sounds and he hospitalized her at the Franklin Foundation Hospital for diagnostic studies and treatment. X-rays of the appellant’s lungs at that time revealed no significant findings. Blood gas studies were conducted and were within normal limits. Pulmonary function studies were conducted and found to be within normal limits. A basic blood count test was performed and was within normal limits. An electrocardiogram was taken and showed evidence of a heart block. A treadmill examination was conducted and the results were indeterminate. Appellant returned to see Dr. Feske on February 22, April 4 and 24, and May 24, 1979, complaining of the same symptoms. During this time, there was some improvement in her condition. At this time, Dr. Feske was of the opinion that the appellant’s “respiratory condition was directly related to and precipitated by an episode of inhalation of some respiratory irritant; and by history from Mrs. Jacobs, that respiratory irritant was a creosote-based paint that she was exposed to at work.” Dr. Feske felt that creosote was a known respiratory irritant, being made of phenol and aromatic hydrocarbons, but admitted that on occasion it was taken by mouth and by inhalation for respiratory illness. Dr. Feske did not have a sputum culture made to determine if appellant had a bacterial infection. Dr. Feske testified that he had treated appellant since 1961 and that she had no significant respiratory problems prior to November of 1976. Appellant did not mention a rash to Dr. Feske, nor did he find any evidence of one. Dr. Feske also treated the appellant for hypothyroidism. Dr. Feske felt that the appellant was disabled because when she was exposed to minor respiratory irritants such as cigarette smoke, she developed episodes of coughing, wheezing, and shortness of breath and could not function.
On June 11, 1979, appellant returned to Dr. Metz and gave a history of working over the weekend at a hospital and developing congestion, stuffiness and hoarseness from cigarette smoke at the hospital.
On October 26, 1979, appellant went to Dr. Brent W. Allain. She gave a history of respiratory distress and tenderness in the abdomen in the left upper quadrant and mid-epigastric region. Dr. Allain had previously treated appellant for hypothyroidism and the toxic condition of thyroiditis. At this time, Dr. Allain found no objective findings of respiratory problems. He treated the appellant with ulcer control medicine. On October 30, 1979, appellant returned to Dr. Allain and her condition was unimproved. She was committed to the Franklin Foundation Hospital from October 30, 1979, until November 1, 1979. Her epi-gastric pain was improved, but she was transferred to the Neurosurgical Service due to an abnormal skull X-ray.
On December 13, 1979, the appellant was again examined by Dr. Emory at the Ochs-ner Hospital. She gave a history of being unable to work because of sensitive airways and could not stand any type of strong odors, fumes or smoke because they caused paroxysms of severe coughing. Dr. Emory’s examination revealed no breathing distress, and no coughing during the 45 minute interview. The appellant’s eyes, ears, nose, throat and lungs were clear. Dr. Emory performed spirometry testing to evaluate the appellant’s breathing capacity and checked her arterial blood gases. The spiro-metry test was within normal limits and there was a mild reduction of oxygen in the arterial blood gases due to obesity. Dr. Emory testified that the 1977 and 1979 tests were compatible and that if there was an *1235 impairment of the pulmonary functions, it would have shown up over the two year period. Dr. Emory was of the opinion that the appellant was capable of returning to her normal activities.
On January 18, 1980, the appellant again consulted Dr. Allain concerning a tender region on her right thigh and a sore throat. Dr. Allian could not associate these symptoms with the creosote inhalation. The appellant again visited Dr. Allain on March 21, 1980, concerning the tender region on her right thigh. Appellant consulted with Dr. Allain on March 27,1980, for breast and pelvic examinations which were normal.
On September 10,1980, the appellant consulted with Dr. Metz and gave a history of wheezing whenever she got around smoke. Dr. Metz’s examination detected no wheezing and found no remarkable physical findings. He was unable to give a disability rating at this time because of the brief nature of the examination. His diagnosis was an inflammatory reaction to “something”.
On January 19, 1981, the appellant again consulted with Dr. Allain and for the first time referred to her history of creosote related problems. She complained of coughing, congestion and sputum production. Dr. Allain’s examination revealed thick postnasal drainage, a flushed appearance over the maxillary sinus area, and coarse breath sounds throughout the chest. Dr. Allain assumed that the congestion and sputum production was caused by a streptococcal infection. Dr. Allain gave the appellant a broad spectrum antibiotic, a decongestant and an expectorant and recommended that she continue to use a bronchial dilater. He diagnosed this condition as bronchitis.
On February 3, 1981, the appellant consulted Dr. Phillip S. Perret, a specialist in pulmonary disease and internal medicine. She gave a history of chronic cough, bronchial irritability, nasal congestion and postnasal drainage after being exposed to creosote fumes in November of 1976. Dr. Per-ret’s examination revealed no respiratory distress, quiet breathing, and easy and regular respirations. He observed that the lining of the nose was dry, reddened, and inflamed with some congestion in the nasal membranes.
On February 10, 1981, the appellant returned to Dr. Allain complaining of coughing, congestion and wheezing. Dr. Allain diagnosed this condition as recurrent bronchitis secondary to inhalation of creosote fumes. On February 18,1981, the appellant returned to Dr. Allain complaining of coughing and congestion. Dr. Allain determined that her condition had not improved from the previous visit and was of the opinion that she was disabled from gainful employment at that time. The appellant returned to Dr. Allain again on March 2, 1981. Dr. Allain determined that her condition was greatly improved, her chest was clear, and there was no wheezing. He did detect redness of the oral pharynx and throat. On March 30, 1981, the appellant returned to Dr. Perret. Dr. Perret determined that there was no change in her condition from the February 3,1981, examination. He diagnosed the appellant’s condition as recurrent asthmatic bronchitis associated with previous chemical inhalation with residual chronic bronchial inflammation, coupled with chronic rhinitis and sinusitis resulting from the previous chemical inhalation. Dr. Perret was of the opinion that the appellant was disabled from the point of view that irritating fumes, vapors and smoke would cause her to have attacks. Dr. Perret found that none of the medication he prescribed for the appellant helped her condition and was of the opinion that nothing can be effectively done to eradicate the problem or give significant improvement. Dr. Perret conceded that he took no sputum cultures and that the nasal mucosa culture that he took was positive for staphylococcus.
The appellant again visited Dr. Allain on May 7, 1981, giving a history of coughing, congestion and wheezing because the court reporter was smoking at a deposition taken the previous day. Dr. Allain examined the appellant and found shortness of breath and an elevated respiratory rate. He advised *1236 her to continue to use the bronchial dilater and use inhalation steroids and avoid smoke and nauseous fumes.
The trial of this matter was held and completed on May 11 through 14, 1981.
II. QUANTUM
A. LENGTH OF DISABILITY. Appellant claims that the exposures to creosote fumes in November of 1976 and January of 1977 have rendered her permanently and totally disabled. The appellees contend that the appellant’s allergic reaction from exposure to creosote fumes resulted in a disability of a short duration,[2] and that her present problems are not causally related to that initial exposure. The jury’s award of $5,000.00 indicates that it concluded as a matter of fact that the appellant’s disability was for a minimum period of time. An appellate court should not disturb such a finding of fact unless it is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
When the appellant was examined by Dr. Metz on December 15, 1976, her breath sounds were clear and she had no wheezes. When she was examined by Dr. Coulter on December 16,1976, she no longer had a skin rash, and her chest X-rays, pulmonary function and blood gas tests were normal. Dr. Coulter was of the opinion that she was not disabled at that time. Appellant apparently had a second allergic reaction to creosote when she went to the Life Preserver after New Year’s day in 1977. This second reaction was not nearly as severe as the initial one. After examining the appellant subsequent to the second exposure to creosote, Dr. Coulter was of the opinion that she was not disabled and would become disabled only if she came in contact with the creosote. He felt that subsequent allergic reactions when she was not exposed to creosote fumes indicated that she must be allergic to something other than creosote. He was further of the opinion that the bacterial bronchitis and the allergic reaction to the ampicillin prescribed to treat this condition were not causally related to the creosote exposure. The examination by Dr. Emory on June 21,1977, revealed no objective physiological evidence of abnormality in the appellant’s pulmonary system. Dr. Emory recommended a personality profile because the appellant’s symptoms far exceeded the objective findings. The X-rays, blood gas studies and pulmonary function studies performed for Dr. Feske in February of 1979 were within normal limits. Dr. Emory again examined and tested the appellant in December of 1979, and the tests on her pulmonary system were within normal limits, except for a mild reduction of oxygen in the arterial blood gases due to obesity. Dr. Emory testified that if there was an impairment of the pulmonary functions over the two year period between his tests in 1977 and 1979, it would have shown up. Dr. Emory in 1979 was of the opinion that the appellant was capable of returning to her normal activities. There is no expert medical evidence of record concerning the appellant’s condition from June of 1977 to February of 1979. In view of the above evidence of record, we cannot say that the jury was clearly wrong in determining that the appellant’s allergic reaction to creosote and the disability resulting therefrom were resolved in a short period of time.
B. LOSS OF WAGES. The parties stipulated that the appellant was earning $700.00 per month at the time of the exposure to creosote fumes.[3] Since the evidence of record most favorable to the appellees indicates that the appellant was disabled for a period of approximately one and one-half months, she is entitled to an award for loss of wages of $1,050.00.
C. MEDICAL BILLS AND EXPENSES. The medical bills of record for Dr. Coulter for the period of December 16, *1237 1976, to January 20, 1977, are $56.50. The bill for the Fairview Hospital during the period of December 2, 1976, to December 12, 1976, is $908.15. The bills of record for Dr. Metz from December 2,1976, to December 12, 1976, are $170.00. There are bills during the period of January 11, 1977, to January 26,1977, for prescriptions from the Hebert Walgreen Agency Drugs, Inc. totall-ing $18.11, and there is a bill dated January 14, 1977, from Hamilton Medical Group in the sum of $20.00. There is no evidence of record to show whether the Hamilton and Hebert bills are connected to the initial creosote exposure or to the unrelated bacterial bronchitis subsequently contracted, and, accordingly, appellant has failed to prove entitlement to them. Appellant is entitled to recover a total of $1,134.65 for the bills of Drs. Coulter and Metz and the Fairview Hospital.
D. GENERAL DAMAGES. It is undisputed that the appellant suffered a severe allergic reaction from the inhalation of creosote fumes on November 30, 1976. She was hospitalized for 8 days as a result of respiratory distress and a chemical bronchitis resulting therefrom. She had a second but less severe reaction to a reexposure at the beginning of January of 1977. The disability that the appellant incurred as a result of these allergic reactions was resolved by the middle of January of 1977.
The jury in this case was not required to itemize the different elements of damages and gave a lump sum award of $5,000.00. In view of our determination that the appellant is entitled to $1,050.00 for loss of wages and $1,134.65 for medical bills and expenses, the balance of $2,815.35 is attributable to general damages. An appellate court should not disturb an award for damages made by a trial court unless the record clearly reveals that there was an abuse of the “much discretion” afforded the trier of fact under La.C.C. art. 1934(3). Reck v. Stevens, 373 So.2d 498 (La.1979). In the instant case, the jury apparently accepted the testimony of Drs. Metz, Coulter and Emory and rejected that of the appellant and the other doctors concerning the extent of her disability. After reviewing all of the .evidence in this case, although we feel that the award for general damages is on the low side, we cannot say that the jury abused the much discretion vested in it under the law.
III. CONCLUSION
For the foregoing reasons, we conclude that the jury in the instant case was not clearly wrong in its factual findings and its award for general damages did not abuse the much discretion afforded to it. The judgment in the trial court is affirmed at the appellant’s costs.
AFFIRMED.

. The appellant remarried while this litigation was pending in the trial court.

. The appellees do not contest the causal relationship between the inhalation of the creosote fumes and the initial disability and/or allergic reaction.

. The records filed by Travelers in connection with their intervention indicate that the appellant was paid workmen’s compensation benefits on the basis of an average weekly wage of $116.65.